UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===========================X
DOV ARONOWITZ,

      **Plaintiff,**                                     **COMPLAINT**

           -against-                             **Docket No.: 09 CV 9522**

**BLOOMBERG LP and BLOOMBERG**           **PLAINTIFF DEMANDS A**
**TRADEBOOK LLC,**                         **TRIAL BY JURY**

      **Defendants.**

===========================X

      Plaintiff **DOV ARONOWITZ**, on behalf of himself individually and on behalf of all others similarly situated, by his attorneys, **MORELLI RATNER PC**, complaining of the Defendants herein, upon information and belief respectfully alleges as follows:

      1.      Plaintiff **DOV ARONOWITZ** is a resident of the City, County and State of New York.  Plaintiff **DOV ARONOWITZ** was born on May 16, 1951 and is presently 58-years-old.

      2.      This class action lawsuit arises out of an ongoing wrongful scheme by Defendants **BLOOMBERG LP** and its wholly-owned subsidiary, **BLOOMBERG TRADEBOOK LLC** (collectively, "**BLOOMBERG**") to deprive to discriminate against Plaintiff **DOV ARONOWITZ** and other brokers age 40-years-old and older working in New York and throughout the United States (collectively, "**CLASS MEMBERS**"), because of their age.

      3.      This discrimination includes **BLOOMBERG**'s systematic refusal to afford older employees equal pay for commensurate work; equal opportunities for promotion, advancement, increased compensation, and continued employment; and equal standards for job performance and disciplinary treatment, in violation of The Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. Section 621, et. seq.

4.      Commencing approximately December 2000 until his unlawful termination on or about October 20, 2008, and continuing through the present, Plaintiff **DOV ARONOWITZ** and members of his Class have worked for, and continue to work for, Defendants **BLOOMBERG LP** and its wholly-owned subsidiary, **BLOOMBERG TRADEBOOK LLC**, in the United States as Brokers.

5.      At all times hereinafter mentioned, Defendant **BLOOMBERG LP**, was and remains a limited partnership headquartered in New York, New York, duly organized and existing under and by virtue of the laws of New York.  Defendant **BLOOMBERG LP** employs approximately 9,400 people worldwide.

6.      Commencing approximately 1982 through the present, Defendant **BLOOMBERG LP** was and remains a worldwide subscription service that sells financial data, analytic software, trading tools and news.  Defendant **BLOOMBERG LP** currently provides subscription services to approximately 250,000 subscribers.  In 2006, **BLOOMBERG LP** earned $4.7 billion in revenue and operating profits of $1.5 billion, and was ranked 475 in Fortune Magazine's "Fortune 500."  In 2007, **BLOOMBERG LP** earned over $5 billion in sales; in 2008, nearly $6 billion.  Defendant **BLOOMBERG LP** is the parent company of Defendant **BLOOMBERG TRADEBOOK LLC**. (referred to collectively as "**BLOOMBERG**.")

7.      At all times hereinafter mentioned, Defendant **BLOOMBERG TRADEBOOK LLC** was and is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business in the City of New York, State of New York.  Defendant **BLOOMBERG TRADEBOOK LLC** employs approximately 250 people.

8.      Commencing approximately 1996 through the present, Defendant

**BLOOMBERG TRADEBOOK LLC** was and continues to be the wholly-owned subsidiary of

Defendant **BLOOMBERG LP**, it's parent company.  **BLOOMBERG TRADEBOOK LLC** is a

leading global agency broker used by institutional traders, broker-dealers, hedge fund managers,

market-makers and portfolio managers worldwide.  Defendant **BLOOMBERG TRADEBOOK**

**LLC** provides clients with the trading tools and customer service necessary for comprehensive

front-to-back execution, clearing and settlement solutions for equities, futures, options and FX

instruments.  Defendant **BLOOMBERG TRADEBOOK** is a leading electronic consolidator of

global liquidity, offering customers base trading over 60 global markets and has eight offices on

five continents.

9.      Throughout Plaintiff's employment from approximately December 2000 through

approximately October 20, 2008, Michael Bloomberg was and remains the founding partner of

**BLOOMBERG LP**.  Mr. Bloomberg owns approximately 68% of the company he started when

he was 40-years-old.  Mr. Bloomberg stepped down as Executive Chairman in 2002 when he was

elected Mayor of New York but continues to make executive decisions and exercise control over

**BLOOMBERG LP** and its subsidiary, **BLOOMBERG TRADEBOOK**.  Michael Bloomberg is

directly responsible for creating a corporate culture that embraces youth and rejects age and

experience.

10.     From on or about December 5, 2000 until his unlawful termination on or about

October 20, 2008, Plaintiff **DOV ARONOWTIZ** was employed by Defendants **BLOOMBERG**

**LP** and **BLOOMBERG TRADEBOOK LLC** as a Broker at **BLOOMBERG TRADEBOOK**.

11.     Throughout his employment from on or about December 5, 2000 until on or

about October 20, 2008, Plaintiff **DOV ARONOWITZ** worked at **BLOOMBERG**'s

headquarters in Manhattan, except from approximately September 2005 - July 2007 when

Plaintiff worked at **BLOOMBERG**'s San Francisco office.  Throughout his employment from on

or about December 5, 2000 until his wrongful termination on or about October 20, 2008,

Plaintiff **DOV ARONOWITZ** reported to supervisors in New York, including when Plaintiff

worked out of California.

      12.     At all times material to this Complaint, the individual officers, directors,

supervisors, managers, employees and/or agents mentioned herein, acted within the scope of their

duties as officers, directors, supervisors, managers, employees and/or agents of Defendants

**BLOOMBERG LP** and **BLOOMBERG TRADEBOOK LLC** (hereinafter, these Defendants

shall be collectively referred to as "Defendants **BLOOMBERG**.")

      13.     Jurisdiction of the subject matter of this action is established in this Court under

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 621, et seq, in that

unlawful acts alleged herein were committed within this Court's jurisdiction.

      14.     On or about April 28, 2009, Plaintiff **DOV ARONOWITZ** filed a

discrimination claim with the EEOC.

      15.     On or about November 4, 2009, the EEOC issued a Notice of Right to Sue on

Plaintiff's behalf.

## GENERAL ALLEGATIONS OF AGE DISCRIMINATION

      16.     During Plaintiff **DOV ARONOWITZ**'s employment, there existed and continues

to exist an ongoing and pervasive corporate culture at **BLOOMBERG** that favors employees

under the age of 40 and disfavors older employees, and manifests in discriminatory payment and

treatment of employees over the age of 40. The corporate culture developed by **BLOOMBERG**'s highest-ranking Officers permits, encourages and facilitates age discrimination throughout the company.

17. During their employment at **BLOOMBERG**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** have been bypassed for promotion, effectively demoted, subjected to disparate treatment, terminated, and otherwise discriminated against because of their age.

18. This disparate treatment included and continues to include unequal compensation, as well as unequal opportunities, unequal work assignments, unequal promotions, unduly harsh scrutiny and higher performance standards directed toward Plaintiff and other brokers over the age of 40 as opposed to individuals under the age of 40 similarly employed by and situated at **BLOOMBERG**.

19. Throughout his employment, Plaintiff **DOV ARONOWITZ** was subjected to ongoing and pervasive age discrimination, and a hostile work environment directed toward him and his colleagues over the age of 40 that permeated and continues to permeate **BLOOMBERG**. Older employees, including Plaintiff, were systematically bypassed for promotion by younger, less experienced individuals with less seniority at the company, and older employees, including Plaintiff, were systematically forced out of the company and replaced by younger employees. Indeed, within weeks of resurrecting the lucrative Teachers Retirement System of Texas account, Plaintiff **DOV ARONOWITZ** was fired and replaced by a recently hired 28-year-old.

20. Commencing approximately December 2000 and continuing through the present, Michael Bloomberg, Peter Grauer, Thomas Secunda, Lex Fenwick, Kim Bang, Ken Napolitano and other Executives, Officers, Managers and Supervisors have created and maintained a hostile

work environment through explicit, rampant, pervasive and continued age discrimination against Plaintiff **DOV ARONOWITZ** myself and other older employees in the office.  Under their direction, **BLOOMBERG** was and remains an exclusive club where younger people are promoted and older executives are isolated, rendered impotent and ultimately terminated.

21.     In addition, during the course of Plaintiff's employment, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** were and continue to be subjected to unlawful retaliation as a consequence of their observations and complaints concerning discrimination and harassment in the workplace, including their subjection to a pattern of increasing and palpable hostility culminating in the premature termination of their employment.

**SPECIFIC ALLEGATIONS OF DISCRIMINATION,
HARASSMENT AND RETALIATION IN VIOLATION OF
THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

22.     Plaintiff **DOV ARONOWITZ**, who is now 58-years-old, represents a class of individuals over the age of 40 employed by Defendants **BLOOMBERG** who have been discriminated against by **BLOOMBERG** because of their age.

23.     Commencing on or about December 2000 until his unlawful termination on or about October 20, 2008, Plaintiff **DOV ARONOWITZ** was employed by, and devoted his professional career to, Defendant **BLOOMBERG**.

24.     Plaintiff **DOV ARONOWITZ** brought approximately 25 years of professional experience in sales, finance and management to **BLOOMBERG**.  Before entering this profession, Plaintiff **DOV ARONOWITZ** graduated from York University with a B.A. in Economics in 1972, and earned an MBA from Columbia University in Finance and Marketing in 1981.

25.     During Plaintiff's employment from approximately December 2002 through October 2008, Peter Grauer was and remains Executive Chairman of Defendant **BLOOMBERG LP**, an executive, manager, supervisor and employee of Defendants **BLOOMBERG**.

26.     Throughout Plaintiff's employment from approximately December 2000 through October 20, 2008, Thomas Secunda was a founder and Managing Partner of Defendant **BLOOMBERG LP**, an executive, manager, supervisor and employee of Defendants **BLOOMBERG**.  Thomas Secunda is approximately 53-years-old, some five-years-younger than Plaintiff.

27.     During Plaintiff's employment from approximately December 2000 until he was removed from his position in approximately July 2008, Alexius "Lex" Fenwick was Chief Executive Officer of Defendant **BLOOMBERG TRADEBOOK LLC**, an executive, manager, supervisor and employee of Defendants **BLOOMBERG**.  Lex Fenwick is approximately 50-years-old, some eight-years-younger than Plaintiff.  Mr. Fenwick was replaced by Dan Doctoroff in approximately July 2008.  Dan Doctoroff is approximately 55-years-old, some four-years-younger than Plaintiff.

28.     Throughout Plaintiff's employment from approximately December 2000 through approximately October 20, 2008, Kim Bang was and remains President of Defendant **BLOOMBERG TRADEBOOK, LLC**, an executive, manager, supervisor and employee of Defendants **BLOOMBERG**.  Throughout that time, Mr. Bang reported directly to Chief Executive Officer Lex Fenwick and then to Lex Fenwick's successor, Dan Doctoroff.  Kim Bang is approximately 46-years-old, some 12-years-younger than Plaintiff.

29.     During Plaintiff's employment from approximately December 2000 until his

departure in approximately December 2004, Stephen Bookbinder was Director/Global Head of

Sales for Defendant **BLOOMBERG TRADEBOOK LLC**, an executive, manager, supervisor

and employee of Defendants **BLOOMBERG**.  Throughout that time, Mr. Bookbinder reported

directly to **BLOOMBERG TRADEBOOK** President Kim Bang.  From approximately December

2000 until approximately December 2004, Plaintiff **DOV ARONOWITZ** reported directly to

Mr. Bookbinder.  Stephen Bookbinder is approximately 43-years-old, some 15-years-younger than

Plaintiff.

30.    During Plaintiff's employment from approximately December 2004 until

approximately March or April 2004, "John" Baker replaced Stephen Bookbinder as

Director/Global Head of Sales for Defendant **BLOOMBERG TRADEBOOK LLC**.  During this

time, Plaintiff **DOV ARONOWITZ** reported directly to Mr. Baker.  "John" Baker is

approximately 33-years-old, some 25-years-younger than Plaintiff.  Because Mr. Baker refused to

transfer from London to New York on a permanent basis, Mr. Baker was subsequently replaced by

Ken Napolitano.

31.    During Plaintiff's employment from approximately March or April 2004 through

October 20, 2008, Ken Napolitano was and remains Director/Global Head of Sales for Defendant

**BLOOMBERG TRADEBOOK LLC**, an executive, manager, supervisor and employee of

Defendants **BLOOMBERG**.  Since December 2004, Mr. Napolitano has reported directly to

Bloomberg Tradebook President Kim Bang.  From approximately December 2004 until his

wrongful termination, Plaintiff reported directly to Mr. Napolitano, in addition to various Team

Leaders.  Ken Napolitano is approximately 42-years-old, some 15-years-younger than Plaintiff.

32.    During Plaintiff's first year of employment at Bloomberg from approximately 2000

through approximately 2001, he reported directly to **BLOOMBERG TRADEBOOK LLC**

Midwest Team Leader Richard Lee, a manager, supervisor and employee of Defendants **BLOOMBERG**. Richard Lee was then approximately 42-years-old, and is approximately seven-years-younger than Plaintiff.

33. During his employment from approximately 2001 through approximately 2002, Plaintiff reported directly to **BLOOMBERG TRADEBOOK LLC** West Coast Team Leader Michael McCarthy, a manager, supervisor and employee of Defendants **BLOOMBERG**. Michael McCarthy was then approximately 27-years-old, and is some 22-years-younger than Plaintiff.

34. During the first half of approximately 2003, Plaintiff reported directly to **BLOOMBERG TRADEBOOK LLC** Midwest Team Leader Andre Urbanski, a manager, supervisor and employee of Defendants **BLOOMBERG**. At the time, Andre Urbanski was then approximately 31-years-old, and is some 20-years-younger than Plaintiff.

35. During his employment from approximately July 2003 until approximately February 2005, Plaintiff reported directly to **BLOOMBERG TRADEBOOK LLC** Mid-Atlantic Team Leader David Frisone, a manager, supervisor and employee of Defendants **BLOOMBERG**. David Frisone is approximately 36-years-old, some 22-years-younger than Plaintiff.

36. From approximately February 2005 through approximately April 2005, Plaintiff reported to **BLOOMBERG TRADEBOOK LLC** West Coast Team Leader Gordon Farkouh, a manager, supervisor and employee of Defendants **BLOOMBERG**. Gordon Farkouh is approximately 48-years-old, about 10-years-younger than Plaintiff.

37. During his employment from approximately May 2005 to approximately July 2007, Plaintiff once again reported directly to newly appointed **BLOOMBERG TRADEBOOK LLC** West Coast Team Leader Andre Urbanski, a manager, supervisor and employee of

Defendants **BLOOMBERG**.  Since 2005, Andre Urbanski has reported directly to

**BLOOMBERG TRADEBOOK** Director/Global Head of Sales Ken Napolitano.  As set forth

above, Andre Urbanski is some 20-years-younger than Plaintiff, and is now approximately 38-

years-old.

38.     During his employment from approximately September 2007 until approximately

October 1, 2008, Plaintiff reported directly to **BLOOMBERG TRADEBOOK LLC** Midwest

Team Leader Dean Altman, a manager, supervisor and employee of Defendants **BLOOMBERG**.

Dean Altman reported directly to Bloomberg Tradebook Director/Global Head of Sales Ken

Napolitano.  Dean Altman is approximately 43-years-old, some 15-years-younger than Plaintiff.

39.     During his employment from approximately October 1, 2008 until his wrongful

termination on or about October 20, 2008, Plaintiff reported directly to **BLOOMBERG**

**TRADEBOOK LLC** Midwest Team Leader John Tondera, a manager, supervisor and employee

of Defendants **BLOOMBERG**.  John Tondera is approximately 27-years-old, some 30-years-

younger than Plaintiff.  Team Leader John Tondera and Plaintiff were supervised by Donald

White, who held the newly created position of Head of US Equity Sales.  Donald White, who is

approximately 31-years-old, is about 25-years-younger than Plaintiff.

40.     During his employment from approximately December 2000 through

approximately October 20, 2008, Jeanette Bashford was the most recent of many **BLOOMBERG**

**LP** Human Resources Representatives, a manager, supervisor and employee of Defendants

**BLOOMBERG**.  The Human Resources Department reports directly to **BLOOMBERG LP**

Executive Chairman Peter Grauer, former Chief Executive Officer Lex Fenwick, and present

Chief Executive Officer Dan Doctoroff.  Ms. Bashford is approximately 26-years-old, some 32-

years-younger than Plaintiff.

41.     In approximately December 2000, Plaintiff **DOV ARONOWITZ** was recruited from Hudson Sloane & Company and hired by **BLOOMBERG TRADEBOOK** President Kim Bang and Sales Director Stephen Bookbinder.

42.     Commencing in December 2000, Plaintiff **DOV ARONOWTIZ**'s starting salary at **BLOOMBERG** was $90,000.  Throughout his employment, Plaintiff also received medical, dental, disability and life insurance benefits as well as matching 401k contributions of up to $5,000 annually.

43.     Throughout his employment, Plaintiff **DOV ARONOWTIZ** was one of **BLOOMBERG TRADEBOOK**'s highest-grossing salesmen.

44.     During the course of his employment, Plaintiff **DOV ARONOWITZ** received annual raises, all of which were merit-based increases.

45.     Commencing approximately December 2007 and at the time of his termination in October 2008, Plaintiff **DOV ARONOWITZ**'s base salary had increased to $145,000.

46.     In addition, throughout his employment Plaintiff **DOV ARONOWITZ** earned annual EEC (Equity Equivalency Certificate) bonuses based upon his performance, including the commissions he earned as a Broker.  For the first two years of his employment, Defendants **BLOOMBERG** paid the EEC bonuses (commonly referred to at **BLOOMBERG** as "Certs") the year *after* they were earned and awarded.  Thereafter during his employment, Defendants **BLOOMBERG** paid the EEC bonuses two years *after* they were earned and awarded.  Cert value is based upon the number of Bloomberg terminals installed.  Because of his sales success, Plaintiff's annual bonuses increased dramatically every year.

47.     In 2001, Plaintiff **DOV ARONOWITZ** earned 24 Certs valued at $483.70 each, totaling $11,608.80.  Plaintiff's total compensation for 2001 was about $101,608.80 ($90,000

base salary plus $11,608.80 Cert bonus.)  The Cert bonus for 2001 was paid in January 2002.

48.     In 2002, Plaintiff **DOV ARONOWITZ**'s base salary was raised to $95,000 and he was paid the 35 Certs he earned in 2001 valued at $532.07 each, totaling $18,622.45.  Plaintiff's total compensation for 2002 increased approximately 13%, to $114,842.45 ($95,000 base salary plus $18,622.45 Cert bonus.)  The Cert bonus earned in 2002 was paid in December 2004.

49.     In 2003, Plaintiff **DOV ARONOWITZ**'s base salary was raised to $115,000, and he was paid the 100 Certs he had earned in 2001 valued at $335.75 each, totaling $33,575.  Plaintiff's total compensation for 2003 increased approximately 29%, to $148,575 ($115,000 base salary plus $33,575 Cert bonus.)  The Cert bonus earned in 2003 was paid in December 2005.

50.     In 2004, Plaintiff **DOV ARONOWITZ**'s base salary was raised to $130,000 and he earned 170 Certs valued at $268.15 each, totaling $45,585.50.  Plaintiff's total compensation for 2004 increased approximately 18%, to $175,585.50  ($130,000 base salary plus $45,585.50 Cert bonus.)  The Cert bonus earned in 2004 was paid in December 2006.

51.     In 2005, Plaintiff **DOV ARONOWITZ** earned 200 Certs valued at $313.24 each, totaling $126,503.52.  Plaintiff's total compensation for 2005 increased approximately 46%, to $256,503.52 ($130,000 base salary plus $126,503.52 Cert bonus.)  The Cert bonus Plaintiff earned in 2005 was paid in December 2007.

52.     In 2006, Plaintiff **DOV ARONOWITZ**'s base salary was raised to $140,000 and he earned 265 Certs then valued at $1,117 each, totaling $120,463.  Accordingly, Plaintiff's total compensation for 2006 increased approximately 1.54% to $260,463 ($135,000 base salary plus $120,463 bonus.)  Unfortunately, as a direct consequence of a company-wide decline in terminal sales, the total value of the 265 Certs earned in 2004 and due in December 2006 decreased to $67,815.  Plaintiff's total compensation for 2006 nevertheless increased approximately 1.54%, to

$202,815 ($135,000 base salary plus $67,815 Cert bonus.)]  The Cert bonus Plaintiff earned in 2006 was due in December 2008.  Defendants **BLOOMBERG** failed to pay this bonus following Plaintiff **DOV ARONOWITZ**'s wrongful firing on October 20, 2008.

53.    In 2007, Plaintiff **DOV ARONOWITZ** base salary was raised to $140,000 and he earned 285 Certs valued at approximately $651 each, totaling $185,535.  Once again, as a consequence of market value decline, the total value of 285 Certs as of Plaintiff's termination was approximately $157,190.  Plaintiff's total compensation for 2007 increased by approximately 14%, to approximately $297,190 ($140,000 base salary plus $157,190 Cert bonus.)  The Cert bonus Plaintiff **DOV ARONOWITZ** earned in 2007 is due to be paid in December 2009.  Defendants **BLOOMBERG** failed to pay this following Plaintiff's wrongful firing on October 20, 2008.

54.    In 2008, Plaintiff **DOV ARONOWITZ**'s base salary was $145,000 and Plaintiff earned Certs over the ten months he worked in 2008 prior to his October 20, 2008 termination.  The Cert bonus Plaintiff earned in 2006 was due in December 2008.  The 265 Certs Plaintiff earned in 2006 were valued in December 2008 at $1,121.47 each, totaling $297,190.  Plaintiff **DOV ARONOWITZ**'s total compensation in 2008 should have been $442,190, an increase of approximately 49%.  However, Plaintiff **DOV ARONOWITZ** was fired on October 20, 2008, and Defendants **BLOOMBERG** subsequently failed to pay Plaintiff's 2006 Cert bonus.

55.    During the period from January 1, 2008 through October 20, 2008, as noted above, Plaintiff **DOV ARONOWITZ** also earned Certs payable in 2010.  Prior to his termination, Defendant **BLOOMBERG TRADEBOOK** President Kim Bang and Global Head of Sales Ken Napolitano  informed Plaintiff they were very pleased with his 2008 performance and that he would receive a significant Cert bonus.  Plaintiff **DOV ARONOWITZ** does not

know the number of Certs he earned nor the amount of bonus he should be paid in 2010 because Plaintiff was fired shortly before his Annual Review.

56.    In addition, in approximately July 2008 as part of its "Plan B," Defendants **BLOOMBERG** expressly promised to supplement Plaintiff **DOV ARONOWITZ**'s and the **CLASS MEMBERS'** 2008 Certs with a cash bonus tied to the company's 2009 revenue goals. Under this plan, Plaintiff could have been paid as much as $200,000 on top of his Certs bonus. Moreover, under this plan his 2008 Certs bonus was supposed to be paid in approximately June rather than December 2010.  It was further announced that starting in 2010, the Cert bonus would revert to an annual rather than two-year delayed payout.

57.    Throughout his employment at Defendants **BLOOMBERG**, Plaintiff **DOV ARONOWITZ** routinely received positive written performance Annual Reviews in addition to ongoing verbal praise for his work ranging from "good" to "excellent" to "superlative," and other express praise from his Directors and Team Leaders.  For instance, **BLOOMBERG TRADEBOOK** Director Stephen Bookbinder described Plaintiff as one of the "key members on the team," "an A player" who "in terms of sheer effort and intensity... is one of the harder workers on the team."   Plaintiff **DOV ARONOWITZ** also received praise directly from sales clients, as well as from **BLOOMBERG** colleagues working in core business areas outside **TRADEBOOK**.  For instance, Terminal Sales Team Leader Jill Patricot praised Plaintiff as "an important addition" and "wonderful team player" who "opened up so many doors and sales" for her Team.  Team Leader David Frisone also complimented Plaintiff's "nice work."

58.    On numerous occasions throughout his employment, Plaintiff **DOV ARONOWITZ** received verbal commendations from numerous supervisors and co-workers, including **BLOOMBERG TRADEBOOK** President Kim Bang, Sales Directors Stephen

Bookbinder and Ken Napolitano, and Team Leaders Richard Lee, Gordon Farkouh, Dean Altman, David Frisone and Andre Urbanski, as well as from clients who directly reported to President Kim Bang that Plaintiff was doing a great job.

59.     Moreover, on numerous occasions during his employment, Plaintiff **DOV ARONOWITZ** was praised for facilitating sales for other **BLOOMBERG** divisions while he sold **TRADEBOOK**.  Plaintiff was praised by Terminal Sales Team Leaders in San Francisco, New York and Texas (including John Herring) for opening previously closed doors for terminal sales, increasing terminal sales among existing clients, and selling terminals on their behalf while in the process of selling **TRADEBOOK**.

60.     During his last year with Defendants **BLOOMBERG**, Plaintiff **DOV ARONOWITZ** was responsible for nearly 20 terminal sales in Texas, more than that sold by the **BLOOMBERG** sales staff exclusively dedicated to those sales.  Similarly, **BLOOMBERG LP** FX Sales Team Leader Phillip Cunn praised Plaintiff  for opening seven new accounts for his Team over a period of three months in New York: during the previous two years, his four-person sales team had only opened approximately 20 accounts.

61.     On or about June 19, 2006, Plaintiff **DOV ARONÓWITZ** passed the NASD National Commodity Futures Examination on his first attempt with flying colors, scoring a 91% on Regulations and a 78% on Market Knowledge.  A significant portion of examinees fail this exam.

62.     Throughout his employment at Defendants **BLOOMBERG**, Plaintiff **DOV ARONOWITZ** trained **TRADEBOOK**'s sales force in both New York and San Francisco. Team Leaders have two responsibilities: first, to ensure that salespersons conform to Defendants **BLOOMBERG**'s corporate protocols, norms and procedures and, second, to train salespeople in

functionality and sales skills.  Even though Team Leaders were responsible for training, Plaintiff **DOV ARONOWITZ** was consistently asked by his Team Leaders (Richard Lee, Michael McCarthy, David Frisone, Gordon Farkouh and Andre Urbanski) to perform this function because Plaintiff had more sales expertise and product knowledge than his supervisors.  While Plaintiff performed this responsibility, he was never awarded the title of Team Leader.

63.    During his employment, Plaintiff **DOV ARONOWITZ** was one of approximately 60-70 Brokers employed by Defendant **BLOOMBERG TRADEBOOK** in the United States.  Aside from Plaintiff, the age of these Brokers ranged from approximately 25-40 years old.  Throughout his employment, Plaintiff **DOV ARONOWITZ** was the oldest Broker at Defendant **BLOOMBERG TRADEBOOK**.  At the time of his wrongful termination, Plaintiff was not only the oldest Broker employed by Defendants **BLOOMBERG**, he was also approximately 10-years-older than any of the other Brokers.

64.    During Plaintiff's employment from approximately December 2000 through approximately October 20, 2008, Defendants **BLOOMBERG**'s Human Resources Department reported employee turnover at Defendant **BLOOMBERG LP** as about 40% annually, while Defendant **BLOOMBERG TRADEBOOK**'s employee turnover was approximately above 60% annually.  During Plaintiff's employment, older Brokers were systematically replaced by younger Brokers.

65.    During his employment from approximately December 2000 through approximately October 20, 2008, Plaintiff **DOV ARONOWITZ**'s complaints concerning Defendants **BLOOMBERG**'s bias against older employees, as well as concerning the lack of diversity at the office, were either ignored or met with hostility.

66.    On or about April 22, 2002, in accordance with Defendants **BLOOMBERG**'s

Open Door Policy that expressly encourages employees to "effectively and openly communicate with one another," and further encourages employees to contact "Human Resources, Melinda Wolfe or Peter Grauer, without fear of reprisal" regarding unresolved issues and/or issues concerning managers, Plaintiff **DOV ARONOWITZ** complained to Defendants **BLOOMBERG LP** Chairman Peter Grauer regarding top management's failure to be flexible in addressing the needs of working mothers and the need for ethnic and gender diversity within Defendant **BLOOMBERG TRADEBOOK**'s management.  Mr. Grauer was non-responsive.  Nothing changed.

67.    In approximately 2004, Defendant **BLOOMBERG LP** Managing Partner Tom Secunda and Defendant **BLOOMBERG TRADEBOOK** Chief Executive Officer Lex Fenwick promoted Ken Napolitano, who was then approximately 38-years-old, to Director of Defendant **BLOOMBERG TRADEBOOK** and Global Head of Sales, the highest-ranking Director in sales. Before this promotion, Ken Napolitano was Team Leader in a different division, Terminal Sales, and had no prior experience in brokerage.

68.    At the time of his promotion to the highest-ranking position in sales, Ken Napolitano had significantly less sales experience (approximately 20 years less) than Plaintiff.  For that matter, Ken Napolitano had significantly less professional experience than Plaintiff.  On information and belief, prior to joining Defendants **BLOOMBERG**, Ken Napolitano worked approximately three months at a bucket shop on Long Island before he was allegedly fired for cause, and as a Herbal Life salesman at Penn Station in New York (curiously, he sold their products dressed as Sherlock Holmes.)  Following Ken Napolitano's promotion, Defendants **BLOOMBERG** became even more aggressive in replacing older employees with younger hires.

69.    Throughout his employment at Defendants **BLOOMBERG**, Plaintiff **DOV**

ARONOWITZ was repeatedly bypassed for promotion to Team Leader. Indeed, after Ken
Napolitano became Defendants **BLOOMBERG TRADEBOOK** Director/Global Head of Sales
in approximately December 2004, openings for Team Leader positions were not even posted.
Ken Napolitano's predecessor, Stephen Bookbinder, at least went through the motions of inviting
everyone within **BLOOMBERG TRADEBOOK** who was interested to apply for Team Leader
positions. Conversely, Ken Napolitano summarily awarded Team Leader positions to younger
employees: Plaintiff **DOV ARONOWITZ** was not even given the opportunity to apply. Indeed,
in March 2005 when Plaintiff discovered an opening and requested consideration for West Coast
Team Leader, Ken Napolitano turned Plaintiff down flat. Thus, Plaintiff's progress up the
corporate ladder was thwarted. This was so despite his considerable sales success and despite the
fact that Plaintiff **DOV ARONOWITZ** routinely performed a Team Leader's training
responsibilities.

     70.    Shortly after his promotion to Defendant **BLOOMBERG TRADEBOOK**
Director/Global Head of Sales in 2004, Ken Napolitano promoted Dean Altman to Midwest
Team Leader. Plaintiff **DOV ARONOWITZ** never had the opportunity to apply for this
position: it was not posted. At the time he was selected for promotion, Dean Altman was
approximately in his '30s, approximately 20-years-younger than Plaintiff, and had comparable
professional experience and seniority to Plaintiff at Defendants **BLOOMBERG**. Indeed, Dean
Altman was promoted by Ken Napolitano to Midwest Sales Team Leader in approximately
December 2005 even though he had been demoted from a Team Leader position in 2004.

     71.    In approximately March 2005, Defendant **BLOOMBERG TRADEBOOK**
Global Head of Sales Ken Napolitano asked Plaintiff if he was interested in relocating to San
Francisco and joining the San Francisco-based West Coast Team. Plaintiff **DOV**

ARONOWITZ agreed and in so doing suggested that based upon his direct experience with that territory and his many years of sales and managerial experience, he should be promoted to the position of Team Leader.

72.     In response, in approximately March 2005, Global Head of **BLOOMBERG TRADEBOOK** Sales Ken Napolitano told Plaintiff that he was "looking for someone younger" and with prior Team Leader experience.  When Plaintiff **DOV ARONOWITZ** politely suggested that it was impossible for Plaintiff to obtain prior Team Leader experience if he was never given the opportunity to be one, Mr. Napolitano responded: "I'll think about it but I think you're too old."   Plaintiff was then 53-years-old.

73.     Instead, in approximately May 2005, Defendant **BLOOMBERG TRADEBOOK** Global Head of Sales Ken Napolitano promoted Andre Urbanski to Team Leader for the West Coast.  At the time Plaintiff was bypassed for promotion, Andre Urbanski was approximately 34-years-old, some 20-years-younger than Plaintiff, and had less professional experience and comparable seniority to Plaintiff's at Defendants **BLOOMBERG**.  At the time of his promotion, Andre Urbanski had a dismal track record as Team Leader for the Midwest:  his incompetence and destruction of client relationships was reflected by falling commissions in that region.

74.     Indeed, not only had Andre Urbanski failed the NFA Commodities Series 3 exam five times, he only passed the sixth time after Plaintiff **DOV ARONOWITZ** sat down with him for hours and tutored him.  (Mr. Urbanski was the only member of the entire West Coast Team who had not passed the Series 3 exam.)  Nevertheless, in approximately May 2005, Andre Urbanski became Plaintiff's direct supervisor.

75.     In approximately May 2005, Plaintiff **DOV ARONOWITZ** asked **BLOOMBERG TRADEBOOK** Global Head of Sales Ken Napolitano why he promoted Andre

Urbanski to West Coast Team Leader over him. Ken Napolitano once again admitted that he chose Andre because he wanted someone who was younger and already had Team Leader experience. Napolitano further told Plaintiff he was "too old" for the position, and that he wanted someone with more seniority: Andre Urbanski started at Defendants **BLOOMBERG** six months before Plaintiff.

76.     During this same meeting in approximately May 2005, Plaintiff **DOV ARONOWITZ** informed **BLOOMBERG TRADEBOOK** Global Head of Sales Ken Napolitano that Caroline Wagner was willing to join the West Coast team and recommended her for the team. At the time, Defendants **BLOOMBERG** was having difficulty staffing the team, since few employees wished to relocate from New York to San Francisco. Ken Napolitano responded that Caroline Wagner was married and pregnant, and thereupon remarked to effect: "I don't want any fucking pregnant bitches out in San Francisco who'd then take four months maternity leave." Although Plaintiff pointed out that since Team Leaders David Frisone and Gordon Farkouh each took three months paternity leave when their children were born, women should be able to take maternity leave, Ken Napolitano was not dissuaded. Ms. Wagner's request to transfer was subsequently denied.

77.     Thereafter, in approximately 2005, Plaintiff **DOV ARONOWITZ** applied for the newly-opened position of Boston Team Leader but was once again bypassed for promotion. **BLOOMBERG TRADEBOOK** Director/Global Head of Sales Ken Napolitano instead appointed Tyler Masterson to the position. At the time of her promotion, Tyler Masterson was approximately 31-years-old, some 26-years-younger than Plaintiff, and had little to no prior sales experience, no prior Team Leader experience, and less seniority at Defendants **BLOOMBERG** than Plaintiff. Ms. Masterson's tenure as Team Leader ended in approximately August or

September 2008 following a 200-300% turnover rate by her salesforce. On information and

belief, Ms. Masterson was promoted as the result of her sexual relationship with Mr. Napolitano.

78.     During the ensuing year from approximately May 2005 - May 2006, Plaintiff **DOV**

**ARONOWITZ** repeatedly complained to **BLOOMBERG TRADEBOOK** Director/Global

Head of Sales Ken Napolitano concerning Team Leader Andre Urbanski's inability to train new

employees, inappropriate demeanor with clients, and managerial ineptitude. Plaintiff further

pointed out that he was performing Andre's function without the benefit of his Title. However,

nothing changed.

79.     Instead, on or about October 7, 2005, **BLOOMBERG TRADEBOOK** Director/

Global Head of Sales Ken Napolitano handed Plaintiff a written "Performance Issue" memo

because Plaintiff had changed his first class airfare to coach, and credited his **BLOOMBERG**

business card with the difference. This bizarre disciplinary treatment was in direct retaliation for

Plaintiff's discrimination complaints.

80.     Despite these setbacks, Plaintiff **DOV ARONOWITZ** continued to excel at his

job. For instance, in approximately early 2005, Plaintiff **DOV ARONOWITZ** was single-

handedly responsible for resurrecting the Dimensional Partners account. As a "reward" for this

accomplishment, on or about June 20, 2005, **BLOOMBERG TRADEBOOK** Global Head of

Sales Ken Napolitano gave Plaintiff $50 on his corporate credit card for generating the most new

B Trade (U.S. Equity) commissions ($47,000) in May 2005 alone. During the same month,

Plaintiff's closest New York competitor, Diane Neligan, generated $5,000 in new commissions:

she too received $50. By December 2005, the Dimensional Partners account had already

generated approximately $1.5 million in annual commission.

81.     In 2006, Plaintiff **DOV ARONOWITZ** increased his commission base from

approximately $900,000 to about $5,400,000, and was recognized as "the top sales rep on team WS with regard to CSA accounts."

82.    Nevertheless, in approximately August 2006, Team Leader Andre Urbanski abruptly removed Plaintiff's coverage of Defendants **BLOOMBERG**'s Southern California accounts, including Dimensional Partners, and reassigned Plaintiff to Northern California. This directly impacted Plaintiff's income since Certs are awarded based in part upon the employee's sales commissions. Plaintiff's transfer was in direct retaliation for his numerous complaints regarding his bypass for promotion to Team Leader by Andre Urbanski.

83.    In approximately August 2006, Team Leader Andre Urbanski handed Plaintiff's Southern California accounts to Michael Santos, a newly-hired employee with no prior Sell-Side sales experience. Michael Santos rarely visited clients, and was notorious for attending to personal rather than business matters during "business" travel. As a consequence, within six months of his reassignment Dimensional Partners stopped trading with **TRADEBOOK**, and the commission base Plaintiff **DOV ARONOWITZ** had painstakingly built up began hemorrhaging dramatically. Conversely, Defendants **BLOOMBERG**'s commissions in Northern California increased significantly after Plaintiff's reassignment there.

84.    Moreover, on or about October 5, 2006, Team Leader Andre Urbanski issued Plaintiff **DOV ARONOWITZ** a"Performance Plan" addressing Plaintiff's purported performance issues. At the time, Plaintiff was one of the top salespersons at **BLOOMBERG TRADEBOOK**. This disciplinary action, often a precursor for termination, was in direct retaliation for Plaintiff's repeated complaints concerning his bypass for promotion by an incompetent young man whom Plaintiff helped train. Unfortunately, despite Plaintiff's job success, this pattern of unwarranted disciplinary treatment was repeated by **BLOOMBERG TRADEBOOK** on the heels of

subsequent complaints by Plaintiff. For instance, on or about December 20, 2007,

**BLOOMBERG TRADEBOOK** Team Leader Dean Altman gave Plaintiff a written

"Performance Issue" memo concerning his failure to swipe his office badge one afternoon when

leaving the office (Plaintiff returned at 5:45 p.m.)

85.     In approximately late 2006, Plaintiff **DOV ARONOWITZ** heard about and

applied for the newly-created position of Team Leader for Latin America but was once again

bypassed for promotion. Although the position was not posted, Plaintiff asked **BLOOMBERG**

**TRADEBOOK** President Kim Bang and Director/Global Head of Sales Ken Napolitano to

consider him for the position not only because of his overall sales experience, sales success and

seniority at **BLOOMBERG TRADEBOOK,** but also because of his fluency in Spanish and his

previous sixteen years working and living in Latin America. Mr. Bang initially appeared

enthusiastic about Plaintiff's application. However, Mr. Napolitano instead appointed Camila

Capel to the position. At the time of her promotion, Ms. Capel was approximately 30-years-old,

some 25-years-younger than Plaintiff, had relatively little sales experience, no prior Team Leader

experience, and less seniority at Defendants **BLOOMBERG** than Plaintiff. Ken Napolitano

subsequently explained to Plaintiff that while he was qualified for the position, he chose Ms.

Capel because she was fluent in Portugese and because he wanted a "younger" Team Leader.

Although the Team Leader position was located in Sao Paulo, Brazil, it covered clients located

throughout Central and South America. Ms. Capel had minimal knowledge of Spanish and was

subsequently forced to take Spanish lessons, at company expense, in order to fulfill the job's

requisites. At the same time, Plaintiff **DOV ARONOWITZ** had some working knowledge of

Portugese and was fluent in Spanish.

86.     On repeated occasions during 2006 and the first half of 2007, Plaintiff **DOV**

ARONOWITZ complained to BLOOMBERG TRADEBOOK Global Head of Sales Ken

Napolitano that his 34-year-old Team Leader, Andre Urbanski, was unqualified and incompetent

as a sales manager. Indeed, Andre had some 20-years-less experience than Plaintiff. However,

Plaintiff's complaints were routinely ignored. When Plaintiff repeated these complaints to

TRADEBOOK President Kim Bang, he was told that Defendants BLOOMBERG was satisfied

with Andre Urbanski's performance. Plaintiff DOV ARONOWITZ subsequently complained

directly to Human Resources in approximately April 2007, and was transferred back to New York

in July 2007.

87.    In approximately early 2007, after New York Team Leader Diane Neligan's

constructive termination on the heels of her taking two maternity leaves, Plaintiff DOV

ARONOWITZ once again asked BLOOMBERG TRADEBOOK Director/Global Head of

Sales Ken Napolitano for consideration as Team Leader. (Cindy Carpentier, a woman with many

years of experience on the New York Team, also applied.) However, Ken Napolitano appointed

Richard Grecco to the position. At the time of his promotion, Richard Grecco had no prior sales

experience, no prior Team Leader experience, and only approximately one year of experience at

Defendants BLOOMBERG. At the time of his promotion, Richard Grecco was approximately

40-years-old, approximately 15-years-younger than Plaintiff. Grecco's tenure as Team Leader

ended in approximately August or September 2008 after steadily declining commissions.

88.    In approximately April 2007, during an impromptu meeting with BLOOMBERG

TRADEBOOK Chief Executive Officer Lex Fenwick, Tom O'Donnell, and other members of

the Terminal Sales staff concerning employee turnover and staffing, Mr. Fenwick commented:

"No one over the age of 40 should work in sales." When Tom O'Donnell informed him of Mr.

Fenwick's comments, Plaintiff was shocked: at the time, Plaintiff DOV ARONOWITZ was 55-

years-old.

89.    The same afternoon in approximately April 2007, Plaintiff **DOV ARONOWITZ**

complained to Team Leader Dean Altman concerning **BLOOMBERG TRADEBOOK**

President and Chief Executive Officer Lex Fenwick's ageist remark, and asked: "Does this mean I

should look for another job?"  Altman was non-committal, but told Plaintiff he would "look into

it."

90.    During this same period in approximately April 2007, on information and belief,

**BLOOMBERG LP** President and Chief Executive Officer Lex Fenwick repeated that he would

not hire or promote more women because: "I don't want any pregnant bitches working for me."

91.    The following day, in approximately April 2007, Plaintiff **DOV ARONOWITZ**

was summoned to a meeting with **BLOOMBERG TRADEBOOK** President Kim Bang in a

private conference room on the **TRADEBOOK** floor.  During this meeting, Mr. Bang denied

that **BLOOMBERG LP** President/ CEO Lex Fenwick had said no one in sales should be over the

age of 40.  Plaintiff found this commentary curious, since Mr. Bang was not present during the

discussion where Lex Fenwick made his remark.  When Plaintiff offered as much, Mr. Bang

became visibly agitated, abruptly switched tacks, and yelled: "How dare you repeat such a

comment?"  The **BLOOMBERG TRADEBOOK** President then suggested it was "not good

policy" to repeat such comments, and warned:  "If you ever repeat that remark, you'll be fired!"

Plaintiff was shocked by Mr. Bang's angry reaction, and apologized.

92.    Shortly after this meeting, on the same day in approximately April 2007,

**BLOOMBERG TRADEBOOK** Global Head of Sales Ken Napolitano summoned Plaintiff into

the same meeting room and told him that **BLOOMBERG LP** President and CEO Lex Fenwick

never said that nobody over the age of 40 should be in sales, and again warned Plaintiff not to

repeat the remark or he would be summarily fired.  Plaintiff again apologized.

93.    The day after this meeting in approximately April 2007, apparently having regained his composure, **BLOOMBERG TRADEBOOK** President Kim Bang approached Plaintiff at his desk and whispered to him: "What Lex [CEO Lex Fenwick] really meant to say was that people over the age of 40 don't have the same amount of energy to be in sales as people under 40."  Plaintiff was dismayed.

94.    Thereafter, commencing approximately April 2007 and continuing until his wrongful termination, **BLOOMBERG TRADEBOOK** President Kim Bang and Global Head of Sales Ken Napolitano increasingly removed Plaintiff's responsibilities pertaining to certain sales accounts and disrupted the relationships Plaintiff had established with numerous key clients. During that same period, Ken Napolitano reassigned Plaintiff's business development responsibilities and sales accounts Plaintiff **DOV ARONOWITZ** had nurtured and brought to fruition, to younger, inexperienced Brokers.  This conduct was in direct retaliation for Plaintiff **DOV ARONOWITZ**'s age discrimination complaint.

95.    In approximately October 2007, after three months of exemplary performance selling **TRADEBOOK**'s new FX platform, Global Head of **BLOOMBERG TRADEBOOK** Sales Ken Napolitano charged Plaintiff with reviving the "dead" territory of Texas.  Plaintiff **DOV ARONOWITZ** subsequently worked hard to develop a relationship with all key accounts, including Teachers Retirement System of Texas ("Texas Teachers"), the second largest public retirement system in the United States.  Although Texas Teachers had been a **TRADEBOOK** client for many years, for all intents and purposes it was a "dead" client, rarely if ever trading. Indeed, the number of trades done by Texas Teachers during the approximately 10 years before Plaintiff took over the account could be counted on one hand.  By September 2008, Texas

Teachers was trading consistently and was on target to produce approximately $6-12 million in annual commissions, the largest account brought in to Defendants **BLOOMBERG** in 2008. As a result of Plaintiff **DOV ARONOWITZ**'s efforts, Defendants **BLOOMBERG** earned and should continue to earn approximately $6-12 million annually in commission from the Texas Teachers account.

96.     In approximately September 2008, **BLOOMBERG TRADEBOOK** President Kim Bang and **BLOOMBERG TRADEBOOK** Global Head of Sales Ken Napolitano promoted Don White to Head of U.S. Equity Sales.  Plaintiff **DOV ARONOWITZ** did not have the opportunity to apply for this position: it was not posted.  At the time of his selection for promotion, Don White was approximately 30-years-old, some 27-years-younger than Plaintiff. Don White was brought in from the Research & Strategy Group where he conducted market research and handled clients' FIX ("Financial Industry Protocol") language/connectivity needs. At the time of his promotion, Don White had <u>no</u> prior sales experience whereas Plaintiff **DOV ARONOWITZ** had worked in sales and management for more than 35 years.  In fact, prior to his promotion, Don White had only visited customers under the supervision of a sales person. Nevertheless, Plaintiff was once again bypassed for promotion.

97.     On or about October 1, 2008, Defendants **BLOOMBERG TRADEBOOK** President Kim Bang and Global Head of Sales Ken Napolitano gave Dean Altman the newly-created position of International Equities Midwest Team Leader, and promoted John Tondera to the newly-designated position of U.S. Equities Midwest Team Leader.  Neither position was posted and Plaintiff **DOV ARONOWITZ** was not afforded the opportunity to apply for either position even though Plaintiff had worked in the Midwest territory for over a year, and was experienced in the sale of all five asset classes, including international and domestic equities.  At

the time of his promotion, John Tondera was approximately 26-years-old, some 31 years younger than Plaintiff. John Tondera had previously reported to Don White in the Research & Strategy Group. Like Don White, at the time of his promotion John Tondera had zero sales experience, and had never been allowed to visit a client unless under the direct supervision of a sales person. Nevertheless, John Tondera became Plaintiff's Team Leader and Plaintiff was subsequently required to report to him.

98. On or about September 7, 2008, Plaintiff **DOV ARONOWITZ** was contacted by FAA authorities and told that they had discovered the site of an airplane crash. Seven-and-a-half years earlier, in June 2001, Plaintiff's 24-year-old son Daniel Aronowitz Katz "went missing" when his airplane disappeared somewhere in the San Bernardino mountains. At the time, Plaintiff immediately reported the circumstances to then Head of **BLOOMBERG TRADEBOOK** Sales Stephen Bookbinder, who in turn notified **BLOOMBERG TRADEBOOK** President Kim Bang. Plaintiff **DOV ARONOWITZ** continued working while seven extensive searches were conducted by experienced search-and-rescue teams in California. Despite these efforts, neither his son nor his son's plane were ever located. Through the ensuing years Plaintiff **DOV ARONOWITZ** held onto the hope that his son might still be alive. When he was contacted by the FAA in September 2008, Plaintiff **DOV ARONOWITZ** was asked to provide his DNA for testing: the FAA believed they had uncovered his son's remains. Plaintiff immediately told **BLOOMBERG TRADEBOOK** President Kim Bang of these circumstances and, at Mr. Bang's instruction, informed Human Resources as well. As a consequence of this devastating news, Plaintiff sank into a very deep and serious depression.

99. On or about the week of October 6, 2008, Plaintiff **DOV ARONOWITZ** informed Human Resources Representative Jeanette Bashford of these circumstances, and

explained that if he seemed out of sorts, anxious or depressed, or if his productivity was temporarily affected, this was the reason why. At the time, Ms. Bashford told Plaintiff not to worry about how he appeared at work, and assured Plaintiff that Defendants **BLOOMBERG** understood.

100.   During the period from on or about October 14-16, 2008, Plaintiff **DOV ARONOWITZ** visited Houston, Dallas, Austin and San Antonio, Texas on a pre-scheduled business trip for Defendant **BLOOMBERG TRADEBOOK**. Prior to his departure from New York, Plaintiff alerted his clients he was coming to Texas for a brief visit. Plaintiff confirmed meetings with some of them and told others that he would call them the morning he was in their vicinity to arrange and confirm a meeting.

101.   On or about October 14, 2008, Plaintiff **DOV ARONOWITZ** spent approximately three-and-a-half hours meeting and training his first client in Houston, Palantir Capital Management, LTD. Because his first meeting lasted longer than anticipated (it was scheduled for 30 minutes), Plaintiff was only able to speak to one-two more clients via telephone before flying on to Dallas that afternoon. At the same time, Plaintiff was experiencing worsening emotional distress over the pending news concerning his son.

102.   On or about October 15, 2008, while in Dallas, Plaintiff **DOV ARONOWITZ** was physically and emotionally unable to meet with any clients. Instead, he sat in his hotel room, swabbed his mouth for the DNA test, and experienced an emotional breakdown. During the years since his plane went missing, Plaintiff had never until that moment given up hope that his son was still alive. It took a supreme effort for Plaintiff that afternoon to fly to Austin for more client meetings.

103.   On or about October 16, 2008, Plaintiff **DOV ARONOWITZ** met with new

Midwest Sales Team Leader John Tondera in Austin as well as four clients in Austin and San Antonio. The first meeting at Teacher Retirement Systems of Texas started at 7:30 a.m. and was scheduled for one hour. Instead, because Plaintiff had to both conduct training and resolve numerous issues, the meeting did not end until 1:00 p.m. John Tondera and Plaintiff then visited Third Coast Capital Management LP, a prospective client Plaintiff had uncovered, where Plaintiff presented a demo and was rewarded with a firm commitment from the company to become a **TRADEBOOK** client. Because of time constraints, Plaintiff **DOV ARONOWITZ** then called the two other clients in Austin (University of Texas Investment Management Company and Employees Retirement Systems of Texas) and rescheduled and confirmed meetings with them for the following week or as soon as Plaintiff was able to return to Austin. Team Leader John Tondera and Plaintiff next drove 70 miles to San Antonio for their 3:00 meeting with US Global Investors Inc. When that meeting concluded, they drove to the San Antonio airport to fly back to New York. Even under the best of circumstances, postponement and cancellation of client meetings (whether by Defendants **BLOOMBERG** or the client) occurs, and is customary and a part of doing business. Regardless of the scheduled itinerary, a meeting's duration and success is predicated upon the client's needs: a successful meeting might last five-and-a-half hours or five minutes. Accordingly, itineraries are necessarily fluid.

104.    Overall, despite his anxiety and concern regarding the fate of his son, the number of clients he attempted to meet with during this brief trip, and the time constraints occasioned by travel from New York to four different cities in Texas, Plaintiff **DOV ARONOWITZ**'s brief business trip to Texas was highly successful. Plaintiff held prolonged meetings with three key clients, resolved issues and cemented relationships, closed on a brand new account that would generate significant new commissions, held telephone discussions with several more clients, and

spent a significant amount of time with his new Team Leader, John Tondera. In fact, Plaintiff's

meetings were so positive that one client, Teachers Retirement System of Texas, invited Plaintiff

to stay the weekend and attend a University of Texas Longhorn football game and tailgate.

Plaintiff was willing to do so in order to strengthen the client relationship with this very

important client. Team Leader John Tondera was present during this invite, but said there was

no need for Plaintiff to stay and should return to New York with him.

105.    On or about Friday, October 17, 2008, Plaintiff **DOV ARONOWITZ** returned

to the office and was immediately summoned to a meeting in the Human Resources Department

with **BLOOMBERG TRADEBOOK** President Kim Bang, Director/Global Head of Sales Ken

Napolitano, Head of Equity Sales Don White, and HR Representative Jeanette Bashford where

he was confronted about his inability to see all his clients in Texas. Plaintiff **DOV**

**ARONOWITZ** explained that while overall the three-day trip was successful from a business

perspective, he was unable to meet with everyone in part because he was overwrought, highly

distressed and severely depressed concerning the fate of his son. Plaintiff reminded them that

despite the challenges brought by travel and time constraints, and despite the fact that it was in

no way unusual for **BLOOMBERG** salespeople to have to cancel some appointments on such

trips, Plaintiff had never done so before. Those assembled were aware of what Plaintiff was going

through concerning the fate of his son, but the outcome was premeditated.

106.    Following this brief discussion on or about October 17, 2008, HR Representative

Jeanette Bashford took Plaintiff's employee identification and escorted Plaintiff out of the

building. Plaintiff **DOV ARONOWITZ** was prohibited from returning to his desk to retrieve his

wallet and backpack. Ms. Bashford told Plaintiff she would get back to Plaintiff sometime

during the following week and that he should not return to work in the interim. When Plaintiff

DOV ARONOWITZ asked if he was going to be fired, Ms. Bashford said that Plaintiff could

resign in order to avoid having a firing recorded on his NASD broker's license. Ms. Bashford told

Plaintiff she would contact him the following week to let him know Defendants BLOOMBERG's

final determination.

107.    Two days later, on or about Sunday evening, October 19, 2008, Plaintiff DOV

ARONOWITZ was called by a federal aviation investigator and informed the DNA test results

were positive, the remains were positively identified as those of his son who had indeed perished

in the plane crash.  Plaintiff was devastated.

108.    The following morning, on or about Monday, October 20, 2008 at approximately

8:30 a.m., Plaintiff DOV ARONOWITZ telephoned Ms. Bashford in Human Resources and

informed her that the previous evening he learned his son's remains had been positively identified

and that he was dead.  In accordance with Defendants BLOOMBERG's bereavement policy,

Plaintiff asked to take two weeks bereavement leave, effective immediately, in order to arrange

for his son's funeral and sit Shiva, the seven day period of mourning traditionally observed.  Ms.

Bashford told Plaintiff she would get back to him.

109.    Defendants BLOOMBERG's  Employee Resource and Information Guide for U.S.

employees expressly guarantees bereavement leave: "In the unfortunate event of a family death,

Defendants BLOOMBERG provides time off to employees.  Employees should consult with their

manager and Human Resources to determine the appropriate amount of time off which is

decided at the discretion of the Company."

110.    However, approximately 90 minutes after he informed Human Resources of his

son's death, at approximately 10:00 a.m. on or about October 20, 2008, HR Representative

Jeanette Bashford called Plaintiff DOV ARONOWITZ and told him over the telephone: "We

are firing you." Ms. Bashford then said that alternatively Defendants **BLOOMBERG** would accept his "resignation" in order to protect his U-5 status: either way, the termination of his employment was effective immediately. Ms. Bashford instructed Plaintiff to tender his resignation via email. Plaintiff was stunned.

111.    On or about October 20, 2008, after nearly eight very productive years at the company during which time he produced tens of millions of dollars in fresh commissions, and within two hours of informing Human Resources that his oldest son was dead, Plaintiff **DOV ARONOWITZ** was called and told over the telephone that his employment was terminated, effective immediately. Ms. Bashford said Plaintiff **DOV ARONOWITZ** was fired for failing to meet with some clients during his Texas business trip. This excuse was pretextual.

112.    Prior to his termination on or about October 20, 2008, not only had Plaintiff never been reprimanded for missing appointments on business trips, but he was repeatedly praised for his sales and marketing skills. For instance, on or about October 1, 2003, **TRADEBOOK** Equity Sales Group Leader David Frisone wrote in Plaintiff's Performance Evaluation: "Dave is one of the strongest prospectors that I have worked with to Date (sic.) When he is putting together a trip he immediately gets on the phones and calls all prospects without hesitation and has a knack for consistently getting the meeting." For that matter, Plaintiff **DOV ARONOWITZ** never received any warning concerning his job performance: Plaintiff was consistently one of Defendants **BLOOMBERG**'s top sellers.

113.    Moreover, during his discussion with Human Resources Representative Jeanette Bashford on or about October 20, 2008, Plaintiff **DOV ARONOWITZ** pointed out that Team Leaders Andre Urbanski, Dean Altman and Tyler Masterson were notorious for repeatedly creating phantom appointments with "clients" and ignoring client needs both in the office and

while traveling on "business trips." Plaintiff further informed Ms. Bashford that not only had he previously alerted **BLOOMBERG TRADEBOOK** President Kim Bang and Global Head of Sales Ken Napolitano of this practice, but had expressly complained to Human Resources concerning the same on more than one occasion during the year before his firing. Ms. Bashford replied that she was not interested in engaging in any sort of discussion, and that the decision to terminate Plaintiff's employment was final.

114.    Immediately after this call on or about October 20, 2008, Plaintiff **DOV ARONOWITZ** made several attempts to speak to **BLOOMBERG TRADEBOOK** President Kim Bang, who refused to accept his call. Plaintiff then telephoned **BLOOMBERG TRADEBOOK** Head of Equity Sales Don White, who told Plaintiff : "The decision is out of my hands." Plaintiff **DOV ARONOWITZ** subsequently called **BLOOMBERG TRADEBOOK** Global Head of Sales Ken Napolitano and apologized for engaging in the same behavior he had previously complained about concerning his Team Leaders (i.e., missing scheduled appointments on business trips), and further explained that this was due to his personal circumstances. Napolitano abruptly hung up on Plaintiff. Given the options, Plaintiff was forced to "resign."

115.    At the time of his wrongful termination, Plaintiff **DOV ARONOWITZ** was one of the most senior sales Brokers at Defendant **BLOOMBERG TRADEBOOK**. During the course of the three preceding years, Defendants **BLOOMBERG** had systematically rid itself of most Brokers over the age of 40 and replaced them with younger, less experienced and less qualified individuals under the age of 40. During the period between approximately July 2007 - July 2008, roughly 41% of Defendant **BLOOMBERG TRADEBOOK**'s U.S. sales force (23 employees) were forced to leave the company.

116.    During the three years leading up to his termination, Defendant **BLOOMBERG**

LP had approximately 40-50% turnover, and Defendant **BLOOMBERG TRADEBOOK** approximately 80% turnover whereby the company systematically replaced older employees with younger employees.

117.   At the time of his wrongful termination, Plaintiff **DOV ARONOWITZ** was one of the most senior salespersons at Defendant **BLOOMBERG TRADEBOOK** and was the oldest Broker left at the company.

118.   Shortly after his termination on or about October 20, 2008, Plaintiff **DOV ARONOWITZ** was replaced by Elizabeth Knauss, who is approximately 30-years-younger than Plaintiff. At the time, Elizabeth Knauss was 28-years-old, and had approximately 30 years less professional sales experience and far less seniority than Plaintiff. Indeed, Ms. Knauss had only worked for Defendants **BLOOMBERG** approximately three months: when she was hired by **BLOOMBERG TRADEBOOK** President Kim Bang and Global Head of Sales Ken Napolitano in approximately July or August 2008, she had <u>no</u> prior experience with brokerage sales.

119.   On or about October 21, 2008, the day after Plaintiff **DOV ARONOWITZ** was fired, Elizabeth Knauss started working on Plaintiff's territory. Ms. Knauss was handed Plaintiff's responsibilities even though she did not have nearly enough training to perform those responsibilities.

120.   From on or about October 21, 2008 through the present, Defendants **BLOOMBERG** has never offered Plaintiff **DOV ARONOWITZ** an alternative position with the company, even though Plaintiff was fully qualified for any other sales position with Defendants **BLOOMBERG**, and had successfully held the position as one of its top Sales Representatives throughout his tenure with **BLOOMBERG**.

## AS AND FOR A FIRST CAUSE OF ACTION
### ADEA - AGE DISCRIMINATION

121.    Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** repeat and reallege

each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force

and effect as though more fully set forth at length herein.

122.    As a consequence of Defendants' age discrimination, Plaintiff **DOV**

**ARONOWITZ** and the **CLASS MEMBERS** (i.e., other Brokers age 40-years-old and older

working in New York and throughout the United States) were and continue to be deprived of

equal treatment, including equal pay for commensurate work, equal opportunities for promotion

advancement, increased compensation and continued employment, and equal standards of

conduct and disciplinary treatment, because of their age.

123.    The aforesaid discriminatory acts by Defendant **BLOOMBERG LP** and

Defendant **BLOOMBERG TRADEBOOK LLC**, its executives, directors, supervisors, managers

and/or employees, violated Plaintiff **DOV ARONOWITZ**'s rights and the **CLASS MEMBERS'**

rights as provided under The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

Section 621, et. seq.

124.    As a consequence of Defendants' age discrimination since Plaintiff and the

**CLASS MEMBERS** have been employees of Defendant **BLOOMBERG LP** and Defendant

**BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS**

**MEMBERS** have incurred and continue to incur monetary loss.

125.    As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP**

and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the

**CLASS MEMBERS** have sustained damage and are entitled to economic damages and

liquidated damages as provided under 29 U.S.C. Section 626(b) and 216(b), i.e., ONE BILLION ($1,000,000,000.00) DOLLARS, as well as attorneys fees plus interest and costs.

**AS AND FOR A SECOND CAUSE OF ACTION
NYSHRL - AGE DISCRIMINATION**

126.   Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS**  repeat and reallege each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force and effect as though more fully set forth at length herein.

127.   As a consequence of Defendants' age discrimination, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** (i.e., other Brokers age 40-years-old and older working in New York and throughout the United States) were and continue to be deprived of equal treatment, including equal pay for commensurate work, equal opportunities for promotion advancement, increased compensation and continued employment, and equal standards of conduct and disciplinary treatment, because of their age.

128.   The aforesaid discriminatory acts by Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, its executives, directors, supervisors, managers and/or employees, violated Plaintiff **DOV ARONOWITZ**'s rights and the **CLASS MEMBERS'** rights as provided under The New York State Human Rights Law, Article 15 of the New York Executive Law ("NYSHRL"), 15 N.Y. Exec. Law Section 290, et. seq.

129.   As a consequence of Defendants' age discrimination since Plaintiff and the **CLASS MEMBERS** have been employees of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** have incurred and continue to incur monetary loss.

130.   As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** have been damaged and are entitled to compensatory and economic damages as provided under 15 N.Y. Exec. Law Section 297(4)(c) in the amount of ONE BILLION ($1,000,000,000.00) DOLLARS.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
<u>NYCHRL - AGE DISCRIMINATION</u>

131.   Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** repeat and reallege each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force and effect as though more fully set forth at length herein.

132.   The aforesaid discriminatory acts by Defendant **ALEXANDRA**, its officers, partners, directors, executives, supervisors, managers, and/or employees, perpetrated against Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** because of their age violated Plaintiff **DOV ARONOWITZ**'s and the **CLASS MEMBERS**' rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), <u>et.</u> <u>seq.</u>

133.   As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

134.   As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** have been damaged and are entitled to compensatory damages and punitive

damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory

damages of FIVE HUNDRED MILLION ($500,000,000.00 ) DOLLARS and punitive damages

of FIVE HUNDRED MILLION ($500,000,000.00) DOLLARS, as well as attorneys fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
## ADEA - RETALIATION

135.    Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS**  repeat and reallege

each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force

and effect as though more fully set forth at length herein.

136.    As set forth hereinabove, Plaintiff **DOV ARONOWITZ** formally complained

to his supervisors and the Human Resources Department of Defendants **BLOOMBERG**

concerning the ongoing age discrimination at the company, including Defendant **BLOOMBERG**

**LP's** and Defendant **BLOOMBERG TRADEBOOK LLC's** ongoing practice of refusing to

provide fair compensation to older employees.

137.    Plaintiff made these complaints on his own behalf and on behalf of his fellow

**CLASS MEMBERS**, i.e., other older Brokers employed in the United States by Defendant

**BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**

138.    As a consequence of Plaintiff's complaints concerning age discrimination, Plaintiff

**DOV ARONOWITZ** was subjected to unlawful retaliation, including adverse employment

actions such as demotion, failure to promote, decreased compensation and ultimately

termination.

139.    Other **CLASS MEMBERS** have suffered comparable retaliation as a consequence

of their complaints concerning the companies' ongoing violation of The Age Discrimination in

Employment Act, and of their ongoing attempts to achieve equal pay for equal work.

140.    The aforesaid acts of intentional retaliation by  Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, and their officers, directors, executives, supervisors, managers and/or employees, violated Plaintiff **DOV ARONOWITZ's** rights as well as the rights of the **CLASS MEMBERS** as provided under The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 621, et. seq.

141.    As a consequence of Defendants' retaliation during Plaintiff **DOV ARONOWITZ's** and the **CLASS MEMBERS'** employment by Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** have incurred and continue to incur monetary loss, and other adverse employment actions.

142.    As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and his **CLASS MEMBERS** are entitled to economic damages and liquidated damages as provided under 29 U.S.C. Section 626(b) and 216(b), i.e.,  ONE BILLION ($1,000,000,000.00) DOLLARS, as well as attorneys fees plus interest and costs.

## AS AND FOR A FIFTH CAUSE OF ACTION
### NYSHRL -RETALIATION

143.    Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS**  repeat and reallege each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force and effect as though more fully set forth at length herein.

144.    As set forth hereinabove, Plaintiff **DOV ARONOWITZ** formally complained to

his supervisors and the Human Resources Department of Defendants **BLOOMBERG**,

concerning the ongoing age discrimination at the company, including  Defendant

**BLOOMBERG LP**'s and Defendant **BLOOMBERG TRADEBOOK LLC**'s ongoing practice of

refusing to promote and provide fair compensation to older employees.

145.    Plaintiff made these complaints on his own behalf and on behalf of his fellow

**CLASS MEMBERS**, i.e., other older Brokers employed in the United States by Defendant

**BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**.

146.    As a consequence of Plaintiff's complaints concerning age discrimination, Plaintiff

**DOV ARONOWITZ** was subjected to unlawful retaliation, including adverse employment

actions such as demotion, failure to promote, decreased compensation and ultimately

termination.

147.    Other **CLASS MEMBERS** have suffered comparable retaliation as a consequence

of their complaints concerning the companies' ongoing violation of the New York State Human

Rights Law, and of their ongoing attempts to eradicate age discrimination in the workplace.

148.    The aforesaid acts of intentional retaliation by  Defendant **BLOOMBERG LP**

and Defendant **BLOOMBERG TRADEBOOK LLC**, their officers, directors, executives,

supervisors, managers and/or employees, violated Plaintiff **DOV ARONOWITZ**'s rights as well

as the rights of the **CLASS MEMBERS** as provided under New York State Human Rights Law -

Executive Law Section 290 <u>et. seq.</u>

149.    As a consequence of Defendants' retaliation during Plaintiff **DOV**

**ARONOWITZ**'s and the **CLASS MEMBERS**' employment by Defendant **BLOOMBERG LP**

and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the

**CLASS MEMBERS** have sustained and continue to sustain conscious pain and suffering, great

mental distress, shock, fright and humiliation, and have incurred and continue to incur monetary loss, and other adverse employment actions.

150.     As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and his **CLASS MEMBERS** have been damaged and are entitled to compensatory and economic damages as provided under 15 N.Y. Exec. Law Section 297(4)(c) in the amount of ONE BILLION ($1,000,000,000.00) DOLLARS.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NYCHRL -RETALIATION

151.     Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** repeat and reallege each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force and effect as though more fully set forth at length herein.

152.     As set forth hereinabove, Plaintiff **DOV ARONOWITZ** formally complained to his supervisors and the Human Resources Department of Defendants **BLOOMBERG**, concerning the ongoing age discrimination at the company, including  Defendant **BLOOMBERG LP**'s and Defendant **BLOOMBERG TRADEBOOK LLC**'s ongoing practice of refusing to promote and provide fair compensation to older employees.

153.     Plaintiff made these complaints on his own behalf and on behalf of his fellow **CLASS MEMBERS**, i.e., other older Brokers employed in the United States by Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**.

154.     As a consequence of Plaintiff's complaints concerning age discrimination, Plaintiff **DOV ARONOWITZ** was subjected to unlawful retaliation, including adverse employment

actions such as demotion, failure to promote, decreased compensation and ultimately termination.

155.   Other **CLASS MEMBERS** have suffered comparable retaliation as a consequence of their complaints concerning the companies' ongoing violation of the New York State Human Rights Law, and of their ongoing attempts to eradicate age discrimination in the workplace.

156.   The aforesaid intentional retaliation by Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, their officers, partners, directors, executives, supervisors, managers and/or employees, perpetrated against Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** because they complained of unlawful discrimination and harassment, violated Plaintiff **DOV ARONOWITZ**'s and the **CLASS MEMBER**'s rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

157.   As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

158.   As a consequence of the foregoing misconduct of Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC**, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** have been damaged and are entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of FIVE HUNDRED MILLION ($500,000,000.00 ) DOLLARS and punitive damages of FIVE HUNDRED MILLION ($500,000,000.00) DOLLARS, as well as attorneys fees.

WHEREFORE, Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** demand

judgment against Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC** in the First Cause of Action in the amount of ONE BILLION ($1,000,000,000.00) DOLLARS; Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** demand judgment against Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC** in the Second Cause of Action in the amount of ONE BILLION ($1,000,000,000.00) DOLLARS; Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** demand judgment against Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC** in the Third Cause of Action in the amount of ONE BILLION ($1,000,000,000.00) DOLLARS; and Plaintiff **DOV ARONOWITZ** and the **CLASS MEMBERS** demand judgment against Defendant **BLOOMBERG LP** and Defendant **BLOOMBERG TRADEBOOK LLC** in the Fourth Cause of Action in the amount of ONE BILLION ($1,000,000,000.00) DOLLARS, all together with the costs and disbursements of this action, including attorneys' fees, plus interest, and for any other relief which this Court deems just and proper.

Dated:      New York, New York
            November 16, 2009

                        MORELLI RATNER PC

                        By: _____
                            Martha M. McBrayer, Esq. (MM-7097)
                            Benedict P. Morelli, Esq. (BPM-7597)
                            David S. Ratner, Esq. (DSR-7758)
                            950 Third Avenue, 11th Floor
                            New York, New York  10022
                            (212) 751-9800